## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                     No. 22-CR-1171-JCH

ADRIAN GARCIA,

       Defendant.

### MEMORANDUM OPINION AND ORDER

Before the Court are two motions to suppress filed by Defendant Adrian Garcia: (1) *Mr. Garcia's Motion to Suppress Evidence and Statements* (ECF No. 38) and (2) *Mr. Garcia's Motion to Suppress Out-of-Court and In-Court Identifications* (ECF No. 39). Following full briefing on the motions, this Court held an evidentiary hearing on February 27, 2024. The Court received the official transcript for the hearing on March 21, 2024. Having considered the motions, briefs, evidence, argument, and relevant law, the Court concludes that Defendant's *Motion to Suppress Evidence and Statements* (ECF No. 38) should be denied and his *Motion to Suppress Out-of-Court and In-Court Identifications* (ECF No. 39) should be denied as moot.

### I.    FACTUAL BACKGROUND

Based on the evidence presented at the hearing, the Court finds the testimony of Albuquerque Police Department ("APD") Sergeant Joshua Wood and APD Officer Arianne Morrow credible. Having considered that testimony and the exhibits presented at the hearing, the Court finds the following facts.

On May 22, 2022, APD Sergeant Joshua Wood was investigating a separate incident at the western end of the Arioso Apartments in Albuquerque, New Mexico. (*See* February 27, 2024, Hr'g Tr. (hereinafter "Hr'g Tr.") 8:3-14, 12:25-13:1.) At around 2:26:07 p.m., Sergeant Wood heard a priority alert, which is an ongoing deadly threat, from dispatch that a 911 caller reported that a male had been shot at the Arioso Apartments. (*See* Hr'g Tr. 8:15-21, 10:5-24, 14:21-25; Gov.'s Ex. 1 at 1.) According to the dispatch Sergeant Wood received, the male victim had a head injury, he was possibly shot, and the offender was leaving the scene. (*See* Hr'g Tr. 11:2-24, 13:13-20; Gov.'s Ex. 1 at 1.)

At 2:26 p.m. Officers Arianne Morrow and Garrett Stirling were dispatched to the Arioso Apartments. (Hr'g Tr. 66:5-68:6, 70:1-5; Gov.'s Ex. 1 at 1.) Dispatch told officers to be on the lookout for a blue SUV, but it was unknown if the vehicle was the victim's or shooter's vehicle. (Gov.'s Ex. 1 at 1; Gov.'s Ex. 2 at 0:27-0:1:02.) Officer Morrow understood from dispatch that officers were responding to the scene of a shooting, with a victim who may have been shot, and the suspect was running from the scene. (*See id.* at 68:7-71:8.)

Sergeant Wood advised dispatch at 2:26:33 p.m. that he was at the Arioso Apartments. (*See* Gov.'s Ex. 1 at 2; Hr'g Tr. 14:8-12.) He turned his patrol vehicle around, so he faced east and waited for an additional unit to arrive because a gun was involved. (Hr'g Tr. 13:1-5.)

At 2:27:05 p.m., dispatch informed officers that the suspect was a Hispanic male with a gun and wearing a black backpack, black hoodie, and blue pants.[1] (*See* Gov.'s Ex. 1 at 2; Hr'g Tr. 12:17-21, 17:17-19, 35:15-36:9.) At 2:27:42 p.m., Sergeant Wood reported that he saw a suspect

---

[1] According to the transcript, Sergeant Wood initially referred to the CAD as listing the suspect wearing black pants (Hr'g Tr. 12:21), but the Court finds that dispatch initially reported the suspect was in blue pants, based on the contents of the CAD report saying "BLU PANTS", (Gov.'s Ex. 1 at 2), and Sergeant Wood's later testimony explaining that the CAD entry said he was wearing "blue" pants, and that the CAD report was accurate (Hr'g Tr. 17:17-19, 35:15-36:9).

with a black sweatshirt, blue jeans, and black backpack walking away from the Arioso Apartments, crossing Montgomery Boulevard, heading southbound. (*See* Gov.'s Ex. 1 at 2; Gov.'s Ex. 2 at 1:14-1:24.) Dispatch confirmed that Sergeant Wood's description matched that of the offender. (*See* Gov.'s Ex. 2 at 1:21-1:35.) Sergeant Wood believed the male he saw to be the offender because he was a Hispanic male and was wearing the same outfit described by dispatch. (Hr'g Tr. 17:17-21.) He also thought it was unlikely that two individuals would be wearing a black sweatshirt at the same time, given that it was a warm day of 75-80 degrees. (*See* Hr'g Tr. 17:21-18:2.) He also noted that the suspect emerged from the Arioso Apartments within a minute or two of receiving the dispatch; he was walking briskly across Montgomery; and he unlawfully crossed the street without using a crosswalk, despite that Montgomery was a busy six-lane street. (*See* Hr'g Tr. 18:7-21, 37:10-38:6.)

Sergeant Wood, who was driving his vehicle marked with "Police" and "City of Albuquerque" on its side, and with his lights activated, immediately pulled onto Montgomery. (*See* Hr'g Tr. 19:2-13, 39:12-13.) Sergeant Wood was also wearing his full uniform, displaying his badge of office. (*Id.* at 19:14-16.) After crossing Montgomery and pulling into the same empty parking lot where the suspect was, he parked, opened his vehicle door, and yelled the command, "Stop. Albuquerque Police." (Hr'g Tr. 19:5-20:23, 24:22-26:2, 40:13-23; Gov.'s Ex. 5.) The suspect was approximately 40 yards from Sergeant Wood at the time, and Sergeant Wood could clearly see him. (Hr'g Tr. 20:11-21:3.) The suspect looked at Sergeant Wood and acknowledged that he heard him by responding with a gesture like, "Who me?" (*See* Hr'g Tr. 19:21-20:10, 40:16-18.) No one else was in the parking lot. (Hr'g Tr. 20:9.) The suspect turned away, initially walking away from Sergeant Wood. (Hr'g Tr. 21:4-7.) At 2:28:09 p.m. to 2:28:15 p.m., Sergeant Wood

reported to dispatch that the suspect did not stop for him and was walking southbound through the parking lot. (*See* Hr'g Tr. 15:7-22; Gov.'s Ex. 1 at 2; Gov.'s Ex. 2 at 1:35-1:41.)

Sergeant Wood got back into his vehicle and followed the suspect, at which point he observed and reported that the suspect began running away from him, going westbound, at around 2:28:33 to 2:28:43 p.m. (*See* Hr'g Tr. 21:8-13; Gov.'s Ex. 1 at 2; Gov.'s Ex. 2 at 1:46-1:49.) As the suspect turned the corner to a building, Sergeant Wood lost sight of him very briefly. (Hr'g Tr. 42:24-43:22.) Sergeant Wood then saw the suspect again running along a breezeway patio, and he observed that he was holding a black handgun. (*See* Hr'g Tr. 17:3-6, 21:22-23, 43:17-44:4.) Sergeant Wood, still in his vehicle, continued following the suspect and saw him jump over a patio wall and throw his gun over towards the rocks. (*See* Hr'g Tr. 17:4-8, 22:2-16, 26:3-7; Gov.'s Ex. 3A & 5.) Sergeant Wood drove from the parking lot onto Julie Street. (*See* Hr'g Tr. 44:5-18.)

Sergeant Wood reported that the suspect was running through the Yeller Sub parking lot west of Julie Street. (Gov.'s Ex. 2 at 1:51-1:57; Hr'g Tr. 22:20-24.) The Yeller Sub parking lot and the TJ Maxx parking lot are all one big parking lot in the same shopping complex. (*See* Hr'g Tr. 22:22-23:1.) At 2:29:09 p.m., he reported that the suspect was wearing a black baseball cap, a black sweatshirt, dark blue jeans, and white tennis shoes. (*See* Gov.'s Ex. 1 at 2; Gov.'s Ex. 2 at 1:56-2:05; Hr'g Tr. 16:1-21.)

He reported seven seconds later that the suspect was back on Montgomery westbound and taking off his black hat. (*See* Gov.'s Ex. 1 at 2; Gov.'s Ex. 2 at 2:03-2:07; Hr'g Tr. 16:2-2123:16-21, 24:7-12, 26:8-14, 50:18-19; Gov.'s Ex. 4-A.) Sergeant Wood briefly lost sight of him in the Yeller Sub and TJ Maxx parking lot, reporting that the suspect was in the parking lot somewhere. (*See* Hr'g Tr. 46:1-8; Gov.'s Ex. 1 at 3; Gov.'s Ex. 2 at 2:08-2:12.) Sergeant Wood followed him into the TJ Maxx parking lot. (*See* Hr'g Tr. 46:17-50:9; Def.'s Ex. F & G.) Sergeant Wood

observed the suspect in the parking lot making elusive movements, trying to hide and duck between cars while he was moving west and trying to get away from police. (*See* Hr'g Tr. 23:2-11, 50:6-15; Gov.'s Ex. 1 at 2; Gov.'s Ex. 2 at 1:41-2:15.) By his movements, Sergeant Wood believed the suspect was attempting to flee from the officers. (*See* Hr'g Tr. 23:13-21.) The parking lot was busy, filled with cars and there were numerous shoppers. (*See* Hr'g Tr. 23:22-24:2.)

In the meantime, Officer Morrow had been diverted to the TJ Maxx parking lot where the incident was unfolding. (Hr'g Tr. 72:15-20.) She learned from dispatch that the suspect, who had been wearing a black hoodie, dark jeans, a black hat, black backpack, and white shoes, was taking off his hat. (*See id.* at 72:24-73:9.)

At around 2:30:23, other officers were setting up a perimeter around Montgomery and Julie streets near the TJ Maxx. (*See* Hr'g Tr. 55:18-56:5, 87:22-88:6; Gov.'s Ex. 1 at 3; Gov.'s Ex. 2 at 2:08-2:15.) At least three other officers in uniform were on scene with their weapons drawn at the ready when Officer Morrow arrived at the TJ Maxx. (*See* Gov.'s Ex. 8 at 0:00-33; Hr'g Tr. 90:1-15; Def.'s Ex. L at 0:00-02.) After pulling up to the entrance of the TJ Maxx parking lot, she immediately jumped out of her vehicle, and she ran toward the parking lot. (Hr'g Tr. 73:14-18; Gov.'s Ex. 8 0:25-0:48.) At the time, the officers believed the suspect to be armed with a firearm and dangerous. (Hr'g Tr. 75:8.) Officer Morrow was concerned for the safety of officers and civilians and had her firearm at low ready. (*Id.* at 75:9-24, 77:19-78:2.)

Approximately four officers, including Officer Morrow, were yelling at a Hispanic male wearing a white t-shirt, blue jeans, and white shoes to get down on the ground and to put his hands up. (*See* Gov.'s Ex. 8 at 0:33-0:43; Hr'g Tr. 56:6-14, 78:10-25, 80:19-20.) The suspect complied by getting on his knees and raising his hands. (Gov.'s Ex. 8 at 0:33-0:43; Hr'g Tr. 92:6-93:1.) An officer told him to turn around, which he did. (Gov.'s Ex. 2 at 0:43-49; Hr'g Tr. 79:11-17, 94:15-

17.) Officer Morrow placed the suspect in handcuffs and in custody at 2:31:09 p.m., approximately five to six minutes after the initial dispatch was sent. (*See* Gov.'s Ex. 1 at 1-3; Gov.'s Ex. 2 at 2:24-2:49; Hr'g Tr. 28:12-22, 79:19-20, 95:5-14; Gov.'s Ex. 8 at 0:49-1:15.) At least seven officers were in the TJ Maxx parking lot by the time Mr. Garcia was being handcuffed. (*See* Def.'s Ex. L at 0:02-0:04.) Sergeant Wood was one of the officers on scene in the TJ Maxx parking lot when Mr. Garcia was being taken into custody. (*See* Def.'s Ex. L at 0:02-0:28; Hr'g Tr. 23:22-24:12, 44:22-44:23) The area where the suspect was placed in handcuffs was approximately 200 yards from the Arioso Apartments. (*See* Hr'g Tr. 26:20-23; Gov.'s Ex. 5.)

It is standard practice to handcuff and conduct a pat-down search of a suspect believed to be involved in a shooting when the suspect is detained. (*See* Hr'g Tr. 80:1-15, 81:2-7, 85:4-8.) Officer Morrow was trained in the "plus one" rule, meaning that a suspect with a weapon will usually have another weapon as well. (Hr'g Tr. 81:16-22.) Officers immediately conducted a pat-down search of the suspect, recovering two screwdrivers and a magazine with 10 rounds of ammunition. (*See* Gov.'s Ex. 8 at 1:04-2:34; Hr'g Tr. 81:23-83:6.) Officers walked the suspect to Officer Morrow's marked unit where they conducted a second pat-down search to double check for weapons before placing him in the vehicle. (*See* Hr'g Tr. 83:12-84:17, 99:3-13; Gov.'s Ex. 8 at 2:34-4:40.) Officers discovered a knife in his back pocket. (Gov.'s Ex. 8 at 3:27-4:03; Hr'g Tr. 83:24-84:11.) Officers informed the suspect, who was in the back of the police vehicle, that he was being detained pending investigation. (Def.'s Ex. N at 4:50-5:17.)

Meanwhile, Sergeant Wood went to retrieve the gun. (*See* Hr'g Tr. 17:1-8; 22:11-19, 28:2-11; Def.'s Ex. L at 0:23-0:31; Gov.'s Ex. 1 at 3; Gov.'s Ex. 2 at 3:28-3:35.) At 2:33:43 p.m., Sergeant Wood reported that he had the gun and that it will be at Julie and Montgomery. (*See* Hr'g Tr. 28:2-11; Gov.'s Ex. 1 at 3; Gov.'s Ex. 2 at 3:28-35; Gov.'s Ex. 3-C.) Officers recovered a black

handgun at the location where Sergeant Wood saw the suspect throw the gun. (*See* Hr'g Tr. 21:24-22:19, 55:3-6; Gov.'s Ex. 3A, 3B, & 3C.)

At 2:26:18 p.m., officers found a discarded black hat with white and black checkering on the brim under a red Avalanche and a black backpack that the suspect discarded under a red vehicle in the parking lot of the TJ Maxx. (*See* Hr'g Tr. 24:3-21, 27:10-12; Gov.'s Ex. 1 at 4; Gov.'s Ex. 2 at 4:35-5:05; Gov.'s Ex. 4A, 4B, & 7.) Officers also recovered a black hoodie underneath a Ford Explorer in the TJ Maxx parking lot, which the suspect had been wearing. (*See* Hr'g Tr. 26:24-27:9; Gov.'s Ex. 6A & 6B.)

Officers conducted a field identification from one of the eyewitnesses to the shooting, Jane Doe, which officers believed to be a positive identification, and they then considered Mr. Garcia to be under arrest. (*See* Hr'g Tr. 107:23-108:14.) Officer Morrow did not remove the handcuffs, but later took him to the police station. (*See id.*) The suspect was subsequently identified as Adrian Garcia. (*See* Hr'g Tr. 79:21-25.)

A federal grand jury subsequently indicted Mr. Garcia with Carjacking in violation of 18 U.S.C. § 2119(1) (Count 1); Using and Carrying a Firearm During and in Relation to a Crime of Violence, and Possessing a Firearm in Furtherance of such Crime, and Discharging said Firearm in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count 2); and being a Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Count 3).

## II.     MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

In his *Motion to Suppress Evidence and Statements* (ECF No. 38), Defendant seeks suppression of all evidence seized from Mr. Garcia and statements elicited from him as a result of his detention and arrest on May 22, 2022. Regarding his statements, Defendant argues that he did not waive his *Miranda* rights during the custodial interrogation, yet the officer ignored his

invocation of the right to remain silent, so all statements should be suppressed. (*Id.* at 11-15). In response, the United States "notifies the Court that it does not intend to rely on or seek admission of Defendant's statements on the date of the carjacking as substantive evidence during its case-in-chief at trial." (Resp. 13, ECF No. 52.) Given the United States's stipulation that it will not introduce Defendant's statements in its case-in-chief at trial, this issue is moot, and the request to suppress his statements will be denied as moot. The United States, of course, will be held to its stipulation at trial.

Turning to his request to suppress the physical evidence, Defendant argues that he was seized without reasonable suspicion at the moment Sergeant Wood set off after him, or alternatively, when he ordered him to stop in the parking lot. (*See* Def.'s Reply 1, ECF No. 59.) He further contends that he did not voluntarily abandon the firearm, backpack, and items of clothing, because he did so in response to Sergeant Wood's unlawful police order. (*See id.* at 4.) Finally, Defendant Garcia asserts that the officers did not have reasonable suspicion or probable cause to detain or arrest him when they handcuffed him in the TJ Maxx parking lot. The Court addresses, and rejects, each argument in turn.

## A. Defendant was not detained by Sergeant Wood, because he did not obey the command to stop

The question of when a seizure occurs is a question of law determined using an objective test: "whether a reasonable person would have felt free to leave or terminate the encounter." *United States v. Gaines*, 918 F.3d 793, 796 (10th Cir. 2019) (citing *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). In determining whether an encounter between a police officer and a citizen is consensual or is a seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Hernandez*,

847 F.3d 1257, 1263 (10th Cir. 2017). When officers "pursue a citizen in their squad car while the citizen is on foot, courts will consider whether the officers activated their siren or flashers, operated their car in an aggressive manner to block the citizen's course or otherwise control the direction or speed of his movement, displayed their weapons, or commanded the citizen to halt." *Id.* at 1264. "Even if a reasonable person would not have felt free to leave, a seizure would occur only if the suspect yielded to a police officer's show of authority." *Gaines*, 918 F.3d at 796 (quoting *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991)).

Mr. Garcia argues that he was seized the moment Sergeant Wood set off after him, because he commanded Mr. Garcia to stop, he used the car to chase down Mr. Garcia while other officers set up a containment perimeter, and he drew his weapon during the chase. Even if a reasonable person would not have felt free to leave in that moment, that fact alone does not amount to a seizure. For a seizure to occur, the citizen must submit to the officer's show of authority. *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010) ("When an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'") (quoting *Hodari D.*, 499 U.S. at 625-26). Mr. Garcia did not obey Sergeant Wood's command to stop; instead, he fled from him. He was thus not detained at that time.

**B. Defendant voluntarily abandoned the firearm, hat, backpack, and hoodie**

Defendant argues that he could not have voluntarily abandoned the gun because it was the result of Sergeant Wood's "unlawful order to stop or his illicit seizure of Mr. Garcia." (Def.'s Reply 4, ECF No. 59.) According to Defendant, the Government cannot prove that the abandonment of the firearm was voluntary.

The Fourth Amendment does not forbid a police search or seizure of private property that has been abandoned. *United States v. Porter*, 66 F.4th 1223, 1226 (10th Cir. 2023). Determining whether property has been abandoned requires an objective inquiry in which "the court considers whether, in the eyes of a reasonable officer, the defendant manifested an intent to disavow ownership of the property." *Id.* "Abandonment must be voluntary." *United States v. Nicholson*, 144 F.3d 632, 640 (10th Cir. (1998). Where abandonment was a direct consequence of an officer's Fourth Amendment violation, abandonment may be deemed involuntary as a matter of law. *Id.*

Applying these standards here, the Court concludes that a reasonable officer would find that Mr. Garcia manifested an intent to disavow ownership of the firearm, hat, hoodie, and backpack. Mr. Garcia left the items behind in a public area as he attempted to flee from police. Police pursuit does not, by itself, render the abandonment involuntary. *United States v. Morgan*, 936 F.2d 1561, 1570 (10th Cir. 1991). Moreover, the record does not reveal any attempt by Defendant to retrieve his items or to request the officers or anyone else to retrieve the items for him. By voluntarily abandoning this property in a public area without making attempts to protect it from inspection or from recovery by passersby, Mr. Garcia surrendered a reasonable expectation of privacy in the property. *See id.* at 1570-71 (concluding that defendant abandoned gym bag and any privacy interests therein when he threw the bag to side of acquaintance's backyard porch, where backyard abutted open field visible to passersby, tried to flee from police who were pursuing him, and made no attempt to retrieve bag or request officers or anyone else to retrieve it for him).

As for Mr. Garcia's argument that any abandonment of the firearm and clothing was involuntary as a result of unlawful conduct by Sergeant Wood, the Court disagrees. In *Terry v. Ohio*, 392 U.S. 1 (1968), "the Supreme Court established that a law enforcement officer may, in appropriate circumstances and in an appropriate manner, approach a person to investigate possible

criminal behavior even if he lacks probable cause to arrest." *United States v. Whitley*, 680 F.3d 1227, 1232 (10th Cir. 2012). To be reasonable, an investigative detention must be justified at its inception and be reasonably related in scope to the circumstances that justified the interference in the first place. *See Terry*, 392 U.S. at 19-20. An investigative detention is justified if the officer is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the detained individual may be engaged in criminal activity. *See Terry*, 392 U.S. at 21; *United States v. Hammond*, 890 F.3d 901, 904 (10th Cir. 2018). For reasonable suspicion to exist, the officer must have "some minimal level of objective justification for making the stop," and evidence "falling considerably short of a preponderance satisfies this standard." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (quotations and citations omitted). "So long as officers develop a particularized and objective basis for suspecting an individual may be involved in criminal activity, [they] may initiate an investigatory detention *even if it is more likely than not that the individual is not involved in any illegality*." *United States v. Gurule*, 935 F.3d 878, 885 (10th Cir. 2019) (internal quotations omitted; emphasis in original). The government bears the burden of showing that the investigative detention was lawful. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994).

Sergeant Wood issued a lawful order to stop because he had a reasonable suspicion that Mr. Garcia was the suspect in the shooting at the Arioso Apartments. Dispatch informed officers that they were searching for a Hispanic male, wearing a black hoodie, blue pants, and carrying a black backpack. Dispatch also relayed that the suspect had a gun and had possibly shot a victim who had sustained head injuries. Sergeant Wood, within only one to two minutes of receiving the Priority 1 dispatch, saw Defendant, a Hispanic man who was wearing a black sweatshirt, blue jeans, and a black backpack, walking in a quick manner, out of the apartment complex where the

crime occurred. The description entailed more than merely a generic match for race and gender: Sergeant Wood also observed that the suspect was wearing the same two items of clothing and was carrying a black backpack, as conveyed by dispatch. The specifics of the clothing and backpack, combined with the timing of the man exiting the location of the crime in a hurried manner, provided reasonable suspicion to stop the suspect. The warmth of the day added to the likelihood that this suspect wearing a black sweatshirt was likely the offender. Sergeant Wood thus had reason to believe the man he observed matched the description for the offender. Moreover, Sergeant Wood saw the suspect walk briskly across the six lanes of Montgomery Boulevard without using a crosswalk, which was unlawful. Based on the totality of the circumstances, Sergeant Wood had reasonable suspicion to stop Defendant to investigate him for the crime. He therefore issued a lawful command when ordering him to stop. *Cf. Salazar*, 609 F.3d at 1069-70 (concluding that trooper had reasonable suspicion to suspect criminal activity was afoot where he observed truck pull into parking lot next to closed business, back up the length of the lot, stop next to a commercial vehicle, turn its headlights off, open the door with enough time to have taken property from the vehicle, and then take evasive action by backing away from trooper's patrol car). Additionally, Defendant did not stop or otherwise submit to Sergeant Wood's command, so he was not unlawfully seized.

For all the above reasons, the items Defendant discarded in a public area as he fled – the firearm, hat, sweatshirt, and backpack – were abandoned and were lawfully seized by officers. *Cf. United States v. Boone*, 62 F.3d 323, 326 (10th Cir. 1995) (concluding that defendants voluntarily abandoned bottles of PCP that they threw out of vehicle while police chased them, even though officer initially conducted illegal search of car, because illegality did not cause defendants to flee

at high rate of speed or to throw bottles onto highway). The Court will therefore not suppress those items of evidence.

### C. Officers had reasonable suspicion to detain Mr. Garcia for the shooting and to believe he was armed and dangerous at the time they drew their weapons, handcuffed him, and frisked him, so the detention was lawful

Defendant additionally contends that officers unlawfully arrested him without probable cause when they handcuffed him. He also asserts that officers lacked reasonable suspicion to believe he had committed the shooting because he did not fit the description of the offender. Consequently, Defendant argues that the items seized from his person during the pat-down search must be suppressed.

The use of firearms, handcuffs, and other forceful techniques do not necessarily turn a lawful *Terry* stop into an arrest under the Fourth Amendment, so long as the forceful measures are reasonably necessary for the safety of officers or bystanders. *See United States v. Salas-Garcia*, 698 F.3d 1242, 1249-50 (10th Cir. 2012); *United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998). Reasonableness is the guide, and a court looks at the totality of the circumstances. *See Salas-Garcia*, 698 F.3d at 1249; *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051-52 (10th Cir. 1994). Officers need not be certain that an individual is armed before taking protective measures. *Gama-Bastidas*, 142 F.3d at 1240 (citing *Terry*, 392 U.S. at 27). "However, if police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent." *Melendez-Garcia*, 28 F.3d at 1051.

Similarly, an officer may conduct a limited protective frisk (also commonly called a pat-down search or frisk) to search for weapons if she has a reasonable suspicion that the suspect is armed and dangerous. *See Gurule* , 935 F.3d at 885; *Hammond*, 890 F.3d at 905; *United States v. Garcia*, 751 F.3d 1139, 1142 (10th Cir. 2014).  "The reasonable suspicion needed to justify a pat-

down search 'need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *Garcia*, 751 F.3d at 1143 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Courts look to the totality of the circumstances known to the detaining officer, deferring to the ability of trained officers to distinguish between innocent and suspicious behaviors. *United States v. Briggs*, 720 F.3d 1281, 1285 (10th Cir. 2013).

In this case, the initial detention occurred when the officers drew their firearms at the ready, issued Defendant commands to get down on the ground, and Defendant complied. The initial pat-down search occurred immediately after Officer Morrow handcuffed him. Consequently, the facts to support both the initial detention and the scope of the detention converge. In applying the known facts at the time of Defendant's seizure in the TJ Maxx parking lot, the Court will first address the collective knowledge doctrine and why responding officers, including Officer Morrow, were justified in detaining Defendant for the shooting based on the facts known to Sergeant Wood. Then, the Court will turn to what Officer Morrow knew and why she, and other officers, had reasonable suspicion to believe that Defendant was armed and dangerous, justifying the use of firearms, handcuffs, and a pat-down search without the need to satisfy the probable cause standard.

### 1. Sergeant Wood had reasonable suspicion to believe Defendant committed the violent crime at the Arioso Apartments, justifying officers' detention of Defendant under the vertical collective knowledge doctrine

Where, as here, numerous officers are involved in a seizure, the collective knowledge doctrine comes into play. "Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action." *United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012).[2] In this case, vertical collective knowledge

---

[2] "Under the horizontal collective knowledge doctrine, a number of individual officers have pieces of the probable cause or reasonable suspicion puzzle, but no single officer has sufficient information to satisfy the necessary standard."

applies because Sergeant Wood had reasonable suspicion to stop the suspect and the other responding officers were assisting Sergeant Wood in detaining him.

Sergeant Wood had reasonable suspicion to believe Defendant had committed the violent shooting crime based on the aforementioned discussed facts. In addition, after Sergeant Wood attempted to stop the suspect, the suspect refused to stop for Sergeant Wood, and ran away, which he conveyed to dispatch. These facts, too, added to his reasonable suspicion that the man he saw was the offender. *Cf. Briggs*, 720 F.3d at 1286 ("Although not of ironclad significance, a suspect's evasive or erratic movements are considered as part of the totality of the circumstances that may justify a detention.") (internal quotations omitted); *United States v. Madrid*, 713 F.3d 1251, 1257 (10th Cir. 2013) ("district court did not err in considering Mr. Madrid's attempted exit from the parking lot just after a police car drove by in its reasonable suspicion analysis" because "a suspect's unprovoked flight and other evasive behavior upon noticing police officers is a pertinent factor in determining reasonable suspicion"). Sergeant Wood followed the suspect and communicated to other officers that the suspect was also wearing white tennis shoes and was in the Yeller Sub/TJ Maxx parking lot and had taken off his black hat. (*See* Gov.'s Ex. 1 at 2.) That Defendant was discarding an item of clothing in a public parking lot, while continuing to run away from the item and police, added to the reasonable suspicion to support his detention.

Sergeant Wood personally observed additional facts that added to his reasonable suspicion, but which he did not convey over dispatch. Sergeant Wood saw the suspect toss a firearm and continue running. These facts added to his reason to believe that the suspect had indeed committed the shooting crime and was attempting to dispose of the evidence. In the TJ Maxx parking lot,

---

*Whitley*, 680 F.3d at 1234 n.3. In such a case, the question is whether the individual officers communicated the information they possess individually, thereby pooling their collective knowledge to satisfy the reasonable suspicion or probable cause standard. *Id.*

Sergeant Wood witnessed the suspect make elusive movements, trying to hide and duck between cars while he was moving west and trying to get away from police. Although he did not share these facts with other officers at the time, the facts added to Sergeant Wood's knowledge and reasonable suspicion, and under the vertical collective knowledge doctrine, these facts can be imputed to the other officers. *See Whitley*, 680 F.3d at 1234 ("Under the collective knowledge doctrine, the officer who makes the stop need not have reasonable suspicion that criminal activity is afoot. Instead, the knowledge and reasonable suspicions of one officer can be imputed to another.").

Defendant nonetheless argues that the officers did not have reasonable suspicion to detain him because he was in a white t-shirt at the time of his detention and did not match the generic description for the offender. The Court disagrees. Dispatch's description for Defendant's gender, ethnicity, two items of clothing (black sweatshirt and blue pants), and the black backpack matched with the suspect that Sergeant Wood saw. Sergeant Wood followed this suspect into the TJ Maxx parking lot, and he gave additional information to dispatch that the suspect was wearing a black cap and white tennis shoes, the latter of which he was still wearing when detained. Sergeant Wood saw the suspect discard the hat as he hid, so he and the other officers had reason to believe that the suspect might shed additional clothes in his attempt to hide. That Defendant was now in a white t-shirt thus did not dispel Sergeant Wood's reasonable suspicion. Officers located Defendant between the vehicles in the parking lot as described by Sergeant Wood. Although Sergeant Wood was not among the initial officers who detained Defendant, he was in the same parking lot and believed that the officers had detained the suspect he was chasing. (*See* Hr'g Tr. 17:3-8.)

Based on the totality of the circumstances, Sergeant Wood had a reasonable suspicion that justified detaining Defendant for the shooting. The other officers who arrived to assist Sergeant Wood, including Officer Morrow, were likewise justified in relying on his reasonable suspicion

and acted lawfully in stopping him. *See Whitley*, 680 F.3d at 1234 ("Thus, an officer with reasonable suspicion may instruct another officer to make a *Terry* stop without communicating the basis for the stop, so long as the communicating officer has reasonable suspicion to make the stop himself.").

### 2. Detaining officers had reason to believe Defendant was armed and dangerous, justifying the use of firearms at the ready, handcuffs, and a pat-down search without transforming the detention into an arrest

The next question is whether, at the time of the initial detention, officers also acted reasonably in detaining Defendant with firearms at the ready, handcuffing him, and conducting a pat-down search. The Government asserts that the officers had reason to believe Defendant was armed and dangerous, so they reasonably used the measures of force they did for the safety of officers and the public. Defendant argues that officers did not act reasonably, and the seizure constituted an arrest that must be supported by probable cause.

At the time of the detention, Officer Morrow knew the following: (1) approximately six minutes before, officers received a Priority One alert, indicating a victim was in immediate danger and had possibly been shot and the suspect had fled the scene; (2) a credible source, an eyewitness to the crime, had given a description of the suspect, and Sergeant Wood observed the suspect who matched that description and was following him; (3) the initial description had more than generic information, as described *supra*; (4) Sergeant Wood followed the suspect within just a few minutes of the crime directly from the apartment complex to the TJ Maxx parking lot and the suspect failed to stop for him and ran from him; (5) Sergeant Wood saw the suspect discard his hat, indicating that he was attempting to shed identifying clothing; (6) Sergeant Wood gave an additional description of the offender and added that he was wearing white shoes; and (7) the suspect in the

TJ Maxx parking lot matched many of the descriptions given by the 911 caller and Sergeant Wood – the same gender, ethnicity, blue pants, and white shoes.

Officers knew enough facts to believe reasonably that Defendant was the armed and dangerous suspect who had been involved in a shooting with an injured victim. Sergeant Morrow believed the suspect to have a firearm based on the dispatch reports. Sergeant Wood had not conveyed over dispatch before Defendant's detention that the suspect had tossed the firearm. Moreover, based on her training and experience, she understood that armed suspects usually have a second weapon. Officers believed that the suspect had recently shot at a victim and injured a victim, and the parking lot had numerous bystanders. That there were numerous officers at the scene does not ameliorate the risk to the officers and bystanders of a suspect potentially armed with a firearm, especially where the officers had information that the suspect had shot at a citizen minutes before, was trying to escape from officers, and had disregarded commands from Sergeant Wood. *See Hammond*, 890 F.3d at 907 ("But we have never said, nor do we today, that a second officer's presence and ability to 'cover' the first officer eliminates a suspect's supposed dangerousness."). The use of forceful measures – firearms drawn, handcuffs, and the pat-down search – were reasonably necessary for the safety of officers and bystanders and did not violate the Fourth Amendment. *Cf. id.* at 907-08 (officers were justified in conducting pat-down search during traffic stop for broken taillight where they knew occupant was gang member recently arrested for weapons possession, he was riding in car seized during previous arrest, and he was wearing gang colors); *Garcia*, 751 F.3d at 1140-41, 1144-47 (officer had reasonable suspicion to conduct pat-down search of passenger where two weeks prior defendant sought to evade arrest and took combative stance with officer when escape was not feasible; officer knew defendant had criminal record that included armed robbery; and officer needed to turn his back on defendant to

conduct inventory search); *Briggs*, 720 F.3d at 1284, 1286-93 (concluding that officer's detention of defendant by drawing his weapon and ordering him not to run was constitutional where officers saw defendant and his companion in high-crime area suddenly change course and walk with increased speed when officers' marked police vehicle came into view and approached; defendant repeatedly looked over his shoulder; defendant reached for his waistline as if he had a concealed weapon; the two men split paths; when officers asked to speak with them, defendant backpedaled away from officers and his companion fled).

For the foregoing reasons, the Court denies Defendant's request to suppress the items found on his person during the two pat-down searches conducted in the TJ Maxx parking lot. Because all evidence at issue here was discovered during or before the pat-down searches, the Court need not decide whether officers had probable cause to arrest him.[3]

### III.  MOTION TO SUPPRESS OUT-OF-COURT AND IN-COURT IDENTIFICATIONS

Defendant moved to suppress all out-of-court and in-court identifications by Jane Doe on the grounds that they are unreliable and inadmissible under the Due Process Clause. In response to the motion to suppress the identifications, the United States asserts that "it does not intend to rely on or seek admission of evidence of Jane Doe's positive identification of Defendant on the date of the carjacking as substantive evidence during its case-in-chief at trial." (Gov.'s Resp. 2, ECF No. 51.) It will, however, call her as a witness, along with other eyewitnesses, "to describe what – not who – she observed." (*Id.*) It will ask her for a description of the individual and seek admission of her 911 call, but it will not ask her to identify Defendant as a perpetrator before the jury. (*Id.*) Nor will it ask an APD officer whether Jane Doe was able to positively identify Defendant. (*Id.*) At the February 27, 2024, hearing, the Government confirmed that it did not intend

---

[3] It is also unnecessary to reach the Government's alternative argument that the inevitable discovery exception applies.

to present any evidence that a show-up identification occurred, and that Jane Doe's direct testimony would be limited to what she said in her 911 call and what occurred preceding that call. (*See* Hr'g Tr. 110:21-111:6, 113:1-16.)

Given that the Government will not present evidence of Jane Doe's out-of-court identification of Defendant in the show-up, and the Government will not seek an in-court identification of the Defendant from Jane Doe, the Court finds that the *Motion to Suppress Out-of-Court and In-Court Identifications* (ECF No. 39) should be denied as moot. Defendant has moved in a separate motion *in limine* to exclude evidence and testimony related to the identifications. The Court will address that motion in a separate order.

**IT IS THEREFORE ORDERED** that

1.  *Mr. Garcia's Motion to Suppress Evidence and Statements* (**ECF No. 38**) is **DENIED**; and

2.  *Mr. Garcia's Motion to Suppress Out-of-Court and In-Court Identifications* (**ECF No. 39**) is **DENIED AS MOOT**.

_____

**SENIOR UNITED STATES DISTRICT JUDGE**